ORAL ARGUMENT NOT YET SCHEDULED

Case No. 23-3178
(Case Number Below:  1:22-CR-00038-BAH-1)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT


UNITED STATES OF AMERICA, Appellee,

V.

JOLENE EICHER, Appellant


Appellant's Opening Brief On Appeal
From Conviction and Sentence in the
United States District Court for the District of Columbia

Barry Coburn
Coburn, Greenbaum & Eisenstein, PLLC
1710 Rhode Island Avenue, Northwest
Second Floor
Washington, DC  20036
Tel:  202-643-9472
Email:  barry@coburngreenbaum.com

## CERTIFICATE AS TO PARTIES, RULINGS
## <u>UNDER REVIEW, AND RELATED CASES</u>

The Appellant is Jolene Eicher, a natural person.  The Appellee is the United States of America.  The rulings under review are Ms. Eicher's conviction and sentence, as identified more specifically below.  There are no related cases of which we are aware.

## **TABLE OF CONTENTS**

GLOSSARY OF ABBREVIATIONS ..................................................................1

JURISDICTIONAL STATEMENT....................................................................1

STATEMENT OF ISSUES................................................................................1

STATUTES AND REGULATIONS ..................................................................2

STATEMENT OF THE CASE ..........................................................................7

SUMMARY OF ARGUMENT .......................................................................19

ARGUMENT ..................................................................................................21

   I.    Elements of Each Charged Count ......................................................21

   II.   Insufficiency of the Evidence ...........................................................25

   III.   Absence of a Colloquy Concerning Defendant's Right To Testify..........27

   IV.   Inflammatory Content of Government's Opening Statement and Argument 29

CONCLUSION ...............................................................................................32

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ................................33

CERTIFICATE OF SERVICE.........................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Adams v. United States ex rel. McCann*, 317 U.S. 269, 87 L. Ed. 268, 63 S. Ct. 236 (1942) ....................................................................................................28

*Boyd v. United States*, 586 A.2d 670 (D.C. 1991) ................................................28

*Boykin v. Alabama*, 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1968) ..........27

*Carnley v. Cochran*, 369 U.S. 506, 8 L.Ed. 2d 70, 82 S. Ct. 884 (1962) ...............27

*Culberson v. State*, 412 So. 2d 1184 (Miss. 1982) ................................................28

*Harris v. United States,* 402 F.2d 656 (D.C. Cir. 1968) .........................................31

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) .........25

*Johnson v. Zerbst*, 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938) ..............28

*LaVigne v. State*, 812 P.2d 217 (Alaska 1991) .....................................................28

*People v. Curtis*, 681 P.2d 504 (Colo. 1984) ........................................................28

*United States v. Boyd,* 803 F.3d 690 (D.C. Cir. 2015) ...........................................25

*\*United States v. Brown,* 508 F.3d 1066 (D.C. Cir. 2007) ...............................30, 31

*United States v. Cole,* 862 F.2d 361 (D.C. Cir. 1988) ............................................31

*United States v. Dean,* 55 F.3d 640 (D.C. Cir. 1995) ............................................31

*United States v. Monaghan,* 741 F.2d 1434  (D.C. Cir. 1984) ...............................31

*United States v. Olano*, 507 U.S. 301 (1993) ........................................................30

*\*United States v. Ortiz,* 82 F.3d 1066 (D.C. Cir. 1996) ...................................27, 28

*United States v. Sullivan*, 371 U.S. App. D.C. 369, 451 F.3d 884 (D.C. Cir. 2006) ....................................................................................................30

**Statutes**

18 U.S.C.S. § 1752 .........................................................................2, 19, 21, 22

18 USCS § 2118 .........................................................................................3

18 USCS § 3056 .........................................................................................4

28 U.S.C. § 1291 .........................................................................................1

40 U.S.C. § 5104 .........................................................................4, 19, 20, 23, 24

40 USCS § 5106 .........................................................................................7

**Other Authorities**

Fed. R. App. P. 4(b)(1)(A) ...........................................................................1

Fed. R. Crim. P. 29 ......................................................................................25

## GLOSSARY OF ABBREVIATIONS

No abbreviations are utilized in this Brief.

## JURISDICTIONAL STATEMENT

Appellant Jolene Eicher was tried and convicted of four federal criminal offenses in the United States District Court for the District of Columbia. The jury's verdict was returned on June 14, 2023. She was sentenced by the District Court on September 15, 2023. The District Court entered judgment against Ms. Eicher on September 18, 2023. A Notice of Appeal was filed in the District Court by Ms. Eicher's trial counsel on September 28, 2023, which was within the fourteen days from the date of entry of judgment permitted by Fed. R. App. P. 4(b)(1)(A). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Whether there was sufficient evidence to support Count 1, when there was no evidence to show Ms. Eicher entered a restricted area knowingly.

2.     Whether there was sufficient evidence to support charges of disorderly or disruptive conduct in a restricted area when Ms. Eicher did not make physical contact with anyone, or yell or otherwise verbally provoke anyone.

3.     Whether there was sufficient evidence to support Count 4, when the evidence showed that Ms. Eicher merely entered Capitol grounds, stood there and left.

4.     Whether the court must inquire with a criminal defendant directly when she purports to decline to exercise her fundamental constitutional right to testify in her own defense to assure that such right is knowingly and intelligently waived.

5.     Whether it is unduly and unfairly inflammatory for a prosecutor to express a personal opinion that Ms. Eicher "ma[de] possible" a "horrible day in the history of our country, " as well as other similar assertions during opening statement and closing argument.

## STATUTES AND REGULATIONS

18 U.S.C.S. § 1752:

(a) Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or

(4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so, shall be punished as provided in subsection (b).

(5) knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds; or attempts or conspires to do so, shall be punished as provided in subsection (b).

(b) The punishment for a violation of subsection (a) is—

(1) a fine under this title or imprisonment for not more than 10 years, or both, if—

(A) the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm; or

(B) the offense results in significant bodily injury as defined by section 2118(e)(3) [18 USCS § 2118(e)(3)]; and

(2) a fine under this title or imprisonment for not more than one year, or both, in any other case.

(c) In this section—

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

3

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title [18 USCS § 3056] or by Presidential memorandum, when such person has not declined such protection.

40 U.S.C. § 5104:

(a) Definitions. In this section—

(1) Act of physical violence. The term "act of physical violence" means any act involving—

(A) an assault or other infliction or threat of infliction of death or bodily harm on an individual; or

(B) damage to, or destruction of, real or personal property.

(2) Dangerous weapon. The term "dangerous weapon" includes—

(A) all articles enumerated in section 14(a) of the Act of July 8, 1932 (ch. 465, 47 Stat. 654) [unclassified]; and

(B) a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a stiletto, and a knife having a blade over three inches in length.

(3) Explosives. The term "explosives" has the meaning given that term in section 841(d) of title 18.

(4) Firearm. The term "firearm" has the meaning given that term in section 921[(a)](3) of title 18.

(b) Obstruction of roads. A person may not occupy the roads in the United States Capitol Grounds in a manner that obstructs or hinders their proper use, or use the roads in the area of the Grounds, south of Constitution Avenue and B Street and north of Independence Avenue and B Street, to convey goods or merchandise, except to or from the United States Capitol on Federal Government service.

(c) Sale of articles, display of signs, and solicitations. A person may not carry out any of the following activities in the Grounds:

    (1) offer or expose any article for sale.

    (2) display a sign, placard, or other form of advertisement.

    (3) solicit fares, alms, subscriptions, or contributions.

(d) Injuries to property. A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds.

(e) Capitol Grounds and Buildings security.

    (1) Firearms, dangerous weapons, explosives, or incendiary devices. An individual or group of individuals—

        (A) except as authorized by regulations prescribed by the Capitol Police Board—

            (i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device;

            (ii) may not discharge a firearm or explosives, use a dangerous weapon, or ignite an incendiary device, on the Grounds or in any of the Capitol Buildings; or

(iii) may not transport on the Grounds or in any of the Capitol Buildings explosives or an incendiary device; or

(B) may not knowingly, with force and violence, enter or remain on the floor of either House of Congress.

(2) Violent entry and disorderly conduct. An individual or group of individuals may not willfully and knowingly—

(A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

(B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

(C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of—

(i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or

(ii) the Library of Congress;

(D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;

(E) obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings;

(F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or

(G) parade, demonstrate, or picket in any of the Capitol Buildings.

(3) Exemption of government officials. This subsection does not prohibit any act performed in the lawful discharge of official duties by—

(A) a Member of Congress;

(B) an employee of a Member of Congress;

(C) an officer or employee of Congress or a committee of Congress; or

(D) an officer or employee of either House of Congress or a committee of that House.

(f) Parades, assemblages, and display of flags. Except as provided in section 5106 of this title [40 USCS § 5106], a person may not—

(1) parade, stand, or move in processions or assemblages in the Grounds; or

(2) display in the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

## STATEMENT OF THE CASE

Ms. Eicher was charged below with four criminal counts:  Entering or remaining in a restricted building or grounds; engaging in disorderly or disruptive conduct in a restricted building or grounds; disorderly or disruptive conduct in the Capitol building; and parading, demonstrating or picketing in the Capitol building.

7

Following a jury trial that commenced on June 12, 2023, a jury convicted her on all counts on June 14, 2023. The Court imposed sentence upon Ms. Eicher on September 15, 2023. The sentence imposed was two months' incarceration, followed by twelve months of supervised release and a special assessment of $25.00, as to each count, to run concurrently as to each count. This appeal followed.

At trial, the government presented testimony from Inspector Lanelle Hawa of the United States Secret Service. (J.A. at 67). Inspector Hawa was assigned to the United States Secret Service Liaison Division on January 6, 2023. (J.A. at 68–69). On that day, the Secret Service was protecting Vice President Pence and others at the United States Capitol. (J.A. at 69). Mr. Pence was scheduled to arrive at the Capitol at 12:30 p.m. that day. (J.A. at 75–76). The certification of the Electoral College vote was to take place in the House Chamber of the Capitol. (J.A. at 76). Mr. Pence was at the Capitol for the certification of the Electoral College vote. (J.A. at 78). He was serving as President of the Senate that day. (J.A. at 78).

A security perimeter had been set up for the Capitol on January 4. (J.A. at 80). Pursuant to this perimeter, restricted area was designated from which the general public was to have been barred. (J.A. at 81).

After the Vice President arrived at the Capitol, Inspector Hawa led him and his entourage to his office, then to the House Chamber and then back to the Senate Chamber. (J.A. at 84). The Secret Service expressly had planned for multiple movements by Mr. Pence between the House and Senate Chambers that day. (J.A. at 85).

Inspector Hawa learned of a security breach at the Capitol at approximately 1:00 or 1:15 p.m. (J.A. at 86). As the breach worsened, a decision was made to relocate the Vice President to a more secure location. (J.A. at 87–88). Inspector Hawa saw rioters in the building. (J.A. at 90–91).

Inspector Hawa's understanding was that the certification of the Electoral College vote could not, and did not, take place without the Vice President's presence. (J.A. at 93). The proceedings stopped because of the security breach. *Id.* Upon the Vice President's return, the certification proceedings were completed. (J.A. at 95).

Carneysha Mendoza was a Captain with the United States Capitol Police. She also was Commander of the Civil Disturbance Unit and Assistant Commander of the Special Operations Division. On January 6, 2021 she was responsible for monitoring close-circuit cameras showing the Capitol grounds. (J.A. at 104). She authenticated photographs of the Capitol grounds. (J.A. at 108–12). The restricted perimeter was marked with "bike rack[s] and signage." (J.A. at 113). The riot

posed a threat to the officers attempting to maintain order.  (J.A. at 123–24).  In one exhibit, she identified a woman "with what appears to be a mask -- a wrap over her face and a yellow scarf around her head," who was part of a group of people on the Capitol grounds.  (J.A. at 119–20).  In the Captain's opinion, which was admitted without objection, the individuals she described, including the woman with the wrap over her face, posed a threat to the law enforcement officers present at the time (J.A. at 124–25), "because the officers [were] outnumbered."  *Id.*

Captain Mendoza heard multiple calls for assistance from other officers.  (J.A. at 128).  Officers needed assistance.  *Id.*  The crowd compromised and overran the officers' line.  (J.A. at 129).  Government Exhibit 300, a video, was admitted into evidence over defense objection.  The objection was predicated on the proposition that the video, of rioters, did not show the Defendant.  The government did not dispute that proposition but contended it was nonetheless relevant.  (J.A. at 129–32).  The video was shown, with extensive narration by the Captain describing the incursion and other conduct of the rioters.  (J.A. at 132–38).  The government sought to establish a link between the video and Ms. Eicher by eliciting testimony to the effect that she had been shown in the same area, at a different time, in a different exhibit.  (J.A. at 136–37).  The government then displayed its next exhibit, Exhibit 301, another video.  Captain Mendoza affirmed the proposition that this video contained an image of an "individual in a yellow

scarf who appears to have just climbed through the window," (J.A. at 140), into the Senate, where she and other individuals were not authorized to be present. *Id.* The officers were trying to make these individuals go outside the building. (J.A. at 142). Another video, with similar images, marked as Government's Exhibit 301A, also was shown. (J.A. at 142–44). According to Captain Mendoza, the "indications" that these individuals were in an area where they were not permitted were the presence of the officers and an alarm that was sounding. (J.A. at 144). The windows were broken and a door had been pushed open. (J.A. at 144–146). A public address system was sounding but the Captain was unable to describe in detail the verbiage emanating from it, saying: "Again, I can't quote exactly what it says, but directing them to leave the building or evacuate the building, something to that effect." (J.A. at 146). The presence of the individuals described by the Captain was, in his view, a danger to Congress, because the individuals had not been screened and it was unknown if they had weapons or contraband. (J.A. at 147, 150). In another video, Government Exhibit 700A, Captain Mendoza identified the "same person" previously referenced, indicating that it showed her climbing in the window, into an area where she was not authorized to be present. (J.A. at 155–56). Exhibit 700B showed essentially the same thing. (J.A. at 158–59).

Turning to Government's Exhibit 701B, Captain Mendoza explained that this video showed the West Lawn of the Capitol, near the inaugural stage. (J.A. at 159). It showed a person wearing a yellow scarf. (J.A. at 163). Exhibit 701A was a still photograph depicting part of Exhibit 701B, showing the individual in the yellow scarf, inside the Capitol's restricted area. (J.A. at 164–165). He testified that "the persons depicted here" were inside the restricted area, not authorized to be there, and were "disruptive or disorderly" because they "took our officers away from other responsibilities to hold the crowd back from entering the building." (J.A. at 165). Similar testimony was offered based on other government exhibits. (J.A. at 165–71, 179–80). According to Captain Mendoza, these individuals' presence was dangerous for the officers present because the officers' line was overrun and they had to fall back. (J.A. at 170–71).

In the midst of this testimony, defense counsel noted the following objection:

> The government continues to argue collective action when Ms. Eicher is charged with individual crimes. The government has not charged her with a riot. She has not been charged as an accessory or a common threat, or aiding other's actions. He's making a constitutional argument that Ms. Eicher's association with these people makes her guilty of a crime, and that's improper.

(J.A. at 174). The Court responded:

> Well, Mr. Hill, the defense that you have proffered in your papers and in your opening statement is that she did not know

that -- that she was  not authorized to be there. I think the full context of what was going on would be suggestive and certainly relevant as to what any rational person would understand as indicating whether that is a place she should or should not be.

Your objection is overruled.

(J.A. at 174–75).  Captain Mendoza was aware of individual rioters tossing items, this was "common," and it posed a danger to the officers.  (J.A. at 175).  Rioters commonly were shouting, "Fight for Trump."  (J.A. at 175–76).  Another photograph, Government Exhibit 704A, showed the same individual, previously identified, wearing a yellow scarf.  (J.A. at 177–78).   She was inside a restricted area, not authorized to be there, in front of a group of rioters, and within arm's reach of Capitol Police officers.  (J.A. at 178–79).  Similarly, Government Exhibit 706 showed the same individual, in a yellow scarf and olive jacket, near the inaugural stage, in a restricted area.  The following testimony was admitted concerning this exhibit:

Q. And, again, Captain Mendoza, is this an area inside the restricted area?

A. Yes, it is.

Q. And are these persons, including the person you have circled -- are they authorized to be within the restricted area on January 6th?

A. No, sir.

Q. Is their conduct disorderly or disruptive?

A. Yes.

(J.A. at 179–80).  Testimony to the same effect was elicited concerning a series of other government exhibits, depicting what were described as restricted areas on the Capitol grounds, showing the same person present in these areas.  (J.A. at 181–86).

On cross-examination, Captain Mendoza affirmed that she had seen no videos depicting the person in the yellow scarf with a weapon, pushing or otherwise assaulting anyone, chanting, reaching for an officer, spraying anyone, or throwing anything.  (J.A. at 189–90).

On redirect, Captain Mendoza reaffirmed that the restricted areas on the Capitol grounds that day had been marked with bike racks, fencing and signage. (J.A. at 192–94).  With respect to the alarms that were sounding, Captain Mendoza indicated that she could not say for sure "whether any specific individual person would have heard the alarm."  (J.A. at 200).  Finally, the prosecutor elicited Captain Mendoza's opinion that the restricted nature of the restricted area was "something that people should have known at that time."  (J.A. at 201).

District of Columbia Metropolitan Police Officer Noah Duckett was at the Capitol on January 6 in his role as an officer in the MPD Civil Disturbance Unit. (J.A. at 202–04)  He heard a call-out for help from an MPD inspector, an individual of high rank.  (J.A. at 210–12).  He saw fencing and signs indicating he was in a restricted area.  (J.A. at 216).  He heard people yelling hostile things to the

police, and saw fights break out. (J.A. at 218–21). He was hit with things, people tried to take his baton, he was bear-sprayed and was grabbed by the crowd. (J.A. at 220–23). It was a very dangerous situation. (J.A. at 223). In Government Exhibit 302A, which contained footage from Officer Duckett's body-worn camera, Officer Duckett identified a person whom the government contended was Ms. Eicher, wearing an olive/gray jacket and a yellow headwrap, who was close to him. (J.A. at 231–33).

Officer Duckett was in the law enforcement line when it was broken by the rioters. (J.A. at 234–35). This presented a serious risk of injury or death. (J.A. at 236). This activity occurred in the previously described restricted area. (J.A. at 237). Officers were calling for help. *Id.*

In another video exhibit which Officer Duckett authenticated, Exhibit 302D, rioters are shown chanting. (J.A. at 235–40). Rioters were attempting to use fencing as a "throwing object." (J.A. at 238–39). A majority of the officers there were injured. (J.A. at 239). Government Exhibit 104 showed officers being attacked by rioters. Officer Duckett identified an image of a woman in a yellow scarf and face wrap in that exhibit, near the front of the group of rioters. (J.A. at 244–47). Government's Exhibit 105 contained similar imagery. (J.A. at 247–50). The images in Exhibits 104 and 105 occurred inside a restricted area, marked with signs. *Id.* Officers also were giving instructions, to the following effect:

15

Q. And were uniformed officers used to direct people not to enter the restricted grounds?

A. Yes.

Q. Those officers, when they were present, were they giving verbal directions as well as just standing there?

A. Yes.

Q. And what kind of directions would they be giving?

A. Anything from, you know, just "You must leave the area," to, "Don't cross this line," "Make sure you stay -- stay at this point, do not go beyond it."

If people got too close to it, they would be asked to back up, that's, of course, before it became chaos later on.

(J.A. at 251).

On cross-examination, with respect to the woman in the yellow head-wrapping, Officer Duckett offered the following testimony:

Q. . . . You don't have any recollection of that individual?

A. Not specifically on that day, no.

Q. You don't recall her shouting?

A. Not at me, no.

Q. You don't recall her pushing?

A. Not at me, no.

(J.A. at 255–56).  He did not recall her shouting, pulling on the fencing or raising her hand to anyone.  (J.A. at 157).

The government introduced into evidence the yellow scarf and "tannish" jacket it contended Ms. Eicher was wearing on January 6, 2021, as well as pro-Trump literature seized from her.  (J.A. at 260–67).  Cellphone data demonstrated that Ms. Eicher was on the Capitol grounds during the relevant time period.  (J.A. at 270–79).  Her Facebook messaging indicated that she had been pepper-sprayed, that most demonstrators were non-violent, included transmission of an image from inside the Capitol, indicated that she has wanted to go into the Senate hall but had been unable to do so, and described how officers had pushed back the crowd.  (J.A. at 279–82).  One of her Facebook messages said:

> I tried not to get arrested and evaded most of the main chaos, but yeah. This kind of stuff is in my blood. People were helping people, there was a sense of comradeship between most of us, and there was so many examples of people be decedent and good amidst the loud people yelling obscenities (as read).

(J.A. at 282).  The following exchange with a friend appeared in her Facebook account:

> There were a lot of angry Americans there, but also a lot of peaceful ones. A few of us tried to stop them from pushing through the police gates, but then I got pepper sprayed in my eyes.
>
> Q. Would you say that it was both Trump supporters and Antifa that were doing crazy stuff?

17

A. Depends on what you mean by "crazy stuff."

Q. Was it as bad as the media is saying?

A. From my limited perspective, no. There was someone who went around with a spray can and tagged a bunch of areas. They did break the windows of the one section to get into the building, and there were people who took things from the building. I saw one guy with a coat rack, but they don't seem to be reporting that there were some very prominent people yelling for people not to vandalize things, to remain peaceful. And I saw one guy trying to defend the police when one area of the fences were broken through. There was quite a few people saying that this isn't what we came here for. They were only telling one part of the story.

(J.A. at 285).  The Facebook exchange continued:

I may be wrong, but I feel like the building and the general feeling of the government has been made into an idol, and this humbled it a bit. They didn't go after any business or other buildings, and kept yelling: This is our building, we paid for it, let's go in it.

And maybe that's why Trump is hated so much? He brings disgrace to a government that is bent on idolization and keeping up appearances.

Q. I think that is a huge part of it. And as well the idolization of government is huge. I think maybe I am feeling a little guilty because deep down I am kind of like yeah, let's break out the guns and fight.

A. LOL, same.

Q. It's definitely going to get crazy. I have heard people say that this is the last peaceful protest.

A. Yeah. I heard a few of them say they are going to -- they are going back to get their guns and that this can't be

18

won without them.

Q. Good times, LOL.

(J.A. at 286). In a later Facebook message, she said:

> What I saw was -- what I saw were peaceful people that had been angered and frustrated that wanted to reclaim ground they had lost and get to the highest point possible to wave their flag. Reports that the Capitol Building break-in was organized by Antifa.

(J.A. at 292–93). In one of the photographs on her cellphone, Government Exhibit 706, a government investigator indicated she was shown "assisting other rioters up onto the stairs" in the Capitol. (J.A. at 296). She had been at the Ellipse for Mr. Trump's speech before proceeding to the Capitol. (J.A. at 310).

None of the images of Ms. Eicher showed any act of violence, any possession of a weapon, and no sign that she was violent. (J.A. at 300–01). She did not break the window through which she entered and was not near it when it was broken. (J.A. at 302–03). She was not yelling. (J.A. at 307).

## SUMMARY OF ARGUMENT

There was insufficient evidence presented to support Ms. Eicher's convictions. With respect to Count 1, entering or remaining in a restricted building or grounds, there was no evidence to support the proposition that Ms. Eicher entered a restricted area knowingly. The area plainly was restricted before the incursion of rioters, but once the building was overrun with them, Ms. Eicher had

no reason to believe that she was not permitted to be there, so long as she did not engage in violent or otherwise aggressive conduct.  With respect to Count 2, disorderly or disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2), and Count 3, disorderly or disruptive conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D), the government did not present any evidence that Ms. Eicher chanted, yelled, verbally provoked anyone, or engaged in any other disorderly or disruptive conduct. Finally, with respect to Count 4, parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G), the government did not present any evidence that Ms. Eicher did anything more than stand within the Capitol, which does not satisfy the elements of the statute.

Additionally, at trial the Court erred when it did not engage in a colloquy with Ms. Eicher concerning her purported decision not to exercise her constitutional right to testify in her own defense.  Such a decision concerns a personal constitutional right and therefore must be made knowingly and intelligently.  We respectfully submit that a colloquy with the defendant is necessary to assure that such a decision is sufficiently knowingly and intelligently made.  We understand that this would entail a change in the law of this Circuit.

Finally, it was plain error for prosecutors to include sweeping, inflammatory personal opinions into their statements to the jury.  The prosecutor's statements

that Ms. Eicher "ma[de] possible" a "horrible day in the history of our country," and similar assertions, were calculated to arouse the passions or prejudices of the jury so as to constitute plain error warranting reversal, especially given the evidence presented regarding Ms. Eicher's relatively innocuous conduct.

## **ARGUMENT**

### I.     **Elements of Each Charged Count**

We rely upon the District Court's instructions to the jury as to each count. With respect to Count One, the Court instructed the jury:

> Count 1 charges that on or about January 6, 2021, in the District of Columbia, Jolene Eicher did knowingly entering and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the U.S. Capitol and its grounds where the Vice President was temporarily visiting without lawful authority to do so, in violation of 18 U.S.C. Section 1752(a)(1).

> In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

> One, first, the defendant entered or remained in a restricted building or grounds without lawful authority to do so; and two, second, the defendant did so knowingly.

> The term "restricted building or grounds" means any posted, cordoned-off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.

> The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

A person acts "knowingly" if she realizes what she is doing and is aware of the nature of her conduct and does not act through ignorance, mistake, or accident.

In deciding whether the defendant knowingly entered or remained in a restricted building you may consider all of the evidence, including what the defendant did or said.

(J.A. at 321–22).  As to Count Two, the District Court instructed:

Count 2: Disorderly or disruptive conduct in a restricted building or grounds.

Count 2 charges that on or about January 6, 2021, in the District of Columbia, Jolene Eicher did knowingly and with intent to impede and disrupt the orderly conduct of government business and official functions engaged in disorderly and disruptive conduct in a restricted building or grounds in and within such proximity to a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds where the Vice President was temporarily visiting when and so that such conduct did, in fact, impede and disrupt the orderly conduct of government business and official functions, in violation of 18 U.S.C. Section 1752(a)(2).

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt: First, the defendant engaged in disorderly or disruptive conduct or -- in proximity to any restricted building or grounds; second, the defendant did so knowingly and with intent to impede or disrupt the orderly conduct of government business or official functions; and third, the defendant's conduct, in fact, impeded or disrupted the orderly conduct of government business or official functions.

The term "disorderly conduct" occurs when a person is unreasonably loud or disruptive under the circumstances or interferes with another person by jostling against or unnecessarily crowding that person.

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.

The terms "restricted building or grounds" and "knowingly" have the same meanings as described in the instruction for Count 1.

(J.A. at 322–24). Turning to Count Three, the District Court instructed the jury:

Count 3: Disorderly or disruptive conduct in a Capitol Building.

Count 3 charges that on or about January 6, 2021, in the District of Columbia, Jolene Eicher willfully and knowingly engaged in disorderly and disruptive conduct within the U.S. Capitol grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct in that building of a hearing before any deliberation of a committee of Congress or either House of Congress, in violation of 40 U.S.C. Section 5104(e)(2)(D).

In order to find the defendant guilty of this offense, you must find that the government proved each of the following three elements beyond a reasonable doubt: First, the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; second, the defendant acted with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; third, the defendant acted willfully and knowingly.

The term "United States Capitol Buildings" includes the United States Capitol located at First Street Southeast in Washington, D.C.

The term "disorderly or disruptive conduct" has the same meaning described in the instruction for Count 2, defining "disorderly conduct" and "disruptive conduct." For the purposes of Count 3, "the orderly conduct of a session of Congress or either House of Congress" includes the actions of

the Joint Session of Congress convened on January 6, 2021, to certify the Electoral College presidential election of 2020.

A person acts "willfully" if she acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. Willfully does not, however, require proof that the defendant be aware of the specific law or rule that her conduct may be violating. The term "knowingly" has the same meaning described in the instruction for Count 1.

(J.A. at 324–25).  Finally, with respect to Count Four, the District Court instructed:

Count 4: Parading, demonstrating, or picketing in a Capitol Building.

Count 4 charges that on or about January 6, 2021, within the District of Columbia, Jolene Eicher willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol Building, in violation of 40 U.S.C. Section 5104(e)(2)(G).

In order to find the defendant guilty of this offense, you must find that the government proved each of the following two elements beyond a reasonable doubt:
First, the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; second, the defendant acted willfully and knowingly.

The terms "parade" and "picket" have their ordinary meanings.

The term "demonstrate" refers to conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings, but does not include activity such as quiet praying.

The term "knowingly" has the same meaning described in the instruction for Count 1.

24

> And the terms "United States Capitol Buildings" and
> "willfully" have the same meanings described in the
> instructions for Count 3.

(J.A. at 325).

Further, as the District Court indicated concerning Count 4, in denying the

motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 at the close of the

government's case-in-chief,

> Count 4 also has a "willfully" mens rea requirement. And there
> is no way she could have thought rationally that it was okay to
> go into -- that this was a lawful way to go into the building
> given the chaos she just walked through, the sirens blaring, the
> police trying to shove people out of the Senate building in order
> to clear it so the Joint Session of Congress could reconvene. So
> I find that any rational trier of fact would find her guilty on all
> counts.

(J.A. at 213).

## II.    Insufficiency of the Evidence

The evidence presented at trial was legally insufficient to sustain any of the

counts of conviction.

Challenges to evidentiary sufficiency are governed by the following well-

known standard:

> When assessing the sufficiency of the evidence, we ask
> "whether, after viewing the evidence in the light most favorable
> to the prosecution, any rational trier of fact could have found
> the essential elements of the crime beyond a reasonable doubt."
> *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.
> Ed. 2d 560 (1979).

25

*United States v. Boyd,* 803 F.3d 690, 629 (D.C. Cir. 2015).  Challenges to evidentiary sufficiency are reviewed by this Court *de novo.  Id.*

With respect to Count One, charging entry into a restricted area, evidence of the "knowingly" element was absent.  Ms. Eicher was with a large group of people who had entered into the Capitol.  Areas in the Capitol may well have been deemed "restricted" prior to the incursion of this large group of people, but after they were there, there was no evidence presented that Ms. Eicher knew that she was not allowed to follow them in or remain there for a few minutes, any more than a member of the press or a curiosity-seeking passerby would have known that entering the grounds and looking around a severely damaged building, under these unique circumstances, was impermissible.

With respect to Count Two, disorderly or disruptive conduct in a restricted area, the evidence showed that Ms. Eicher entered the Capitol grounds and, essentially, just stood there for a few minutes.  There was no evidence that she provoked anyone, even verbally.  Accordingly, no reasonable factfinder could have found that she sought to "impede or disrupt the orderly conduct of government business or official functions," nor that she did so.  The analysis is the same concerning Count Three.

Finally, with respect to Count Four, no evidence was presented that Ms. Eicher, paraded, demonstrated or picketed in or near the Capitol grounds -- only that she entered the grounds, stood there and left.

Accordingly, as a matter of law, insufficient evidence existed to support any of her convictions.

## III.    Absence of a Colloquy Concerning Defendant's Right To Testify

The District Court does not appear to have engaged in a colloquy with the Defendant concerning her purported decision not to exercise her constitutional right to testify in her own defense.  Ms. Eicher did not testify at trial.

We acknowledge that this Court previously has held that a colloquy between the Court and a criminal defendant, prior to the defendant's exercising her or his right not to testify, is not absolutely required.  *United States v. Ortiz,* 82 F.3d 1066, 1069-72 (D.C. Cir. 1996).  We do not contend that there were any special circumstances here that should have alerted the District Court that defense counsel's announcement of Ms. Eicher's intentions did not actually reflect her choice.  Our submission here is that this Court should revisit *Ortiz* and hold here that such a colloquy is required in all criminal cases where a defendant purports to opt not to testify.  As this Court observed in *Ortiz,*

> In determining whether the district court has an obligation to conduct a colloquy, we recognize that in some other areas involving fundamental and personal constitutional rights that may only be knowingly and intelligently waived by a

> defendant--such as the decision to plead guilty, forego a jury trial, or forego the assistance of counsel--the Supreme Court has required that courts inquire directly of the defendant. *See Boykin v. Alabama*, 395 U.S. 238, 242, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1968) (guilty plea); *Carnley v. Cochran*, 369 U.S. 506, 516, 8 L.Ed. 2d 70, 82 S. Ct. 884 (1962) (assistance of counsel); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 277-78, 87 L. Ed. 268, 63 S. Ct. 236 (1942) (jury trial); *Johnson v. Zerbst*, 304 U.S. 458, 465, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938) (assistance of counsel).

*Id.* at 1070-71.  Our submission is that a defendant's decision not to testify is of at least equal constitutional moment as the other decisions referenced in the quote immediately above.  As the *Ortiz* Court noted:

> Some state courts . . . have gone further, to hold that the trial judge should conduct an on-the-record inquiry with a defendant to assure that the defendant understands that the right to testify is a personal right that only the defendant can waive, focusing as well on the desirability of avoiding post-trial issues and facilitating appellate review.

*Id.* at 1070.  In an accompanying footnote, the Court lists the following such state court holdings:

> *LaVigne v. State*, 812 P.2d 217, 222 (Alaska 1991); *People v. Curtis*, 681 P.2d 504, 514-15 (Colo. 1984) (en banc) (citing *Johnson v. Zerbst*, 304 U.S. 458, 465, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938)); *Culberson v. State*, 412 So. 2d 1184, 1186-87 (Miss. 1982) (en banc); see also *Boyd v. United States*, 586 A.2d 670, 675-79 (D.C. 1991)(dictum).

*Id.*  We seek to adopt the reasoning of these state court holdings here, and others that have followed them, and urge this Court to adopt a rule providing that such a

28

colloquy should be deemed constitutionally required whenever a defendant

manifests an intention not to testify at trial.

## IV. Inflammatory Content of Government's Opening Statement and Argument

In the government's opening statement, the prosecutor made the following

statements:

> Ladies and Gentlemen, on January 6th, a mob stormed the
> United States Capitol. They attacked and they overran police.
> They broke down barriers, windows, and doors. And
> eventually, they overtook the Capitol Building itself and forced
> the members and the staff of Congress to evacuate. They
> stopped the counting of the electoral votes, *and it was a
> horrible day in the history of this country.*  [Emphasis added.]

 (J.A. at 63–64).  After describing the government's anticipated evidence, he said

again:  "As I said at the outset, this was a horrible day in the history of this

country."  (J.A. at 87).

In closing argument, the prosecutor seconded and amplified upon this

opinion, stating:

> On January 6, 2021, a mob stormed the U.S. Capitol, battled
> police, temporarily blocked Congress from completing the
> crucial certification proceeding. And the defendant, Ms. Eicher,
> joined that mob.
>
> *As Mr. Brunwin said in the government's opening statement, it
> was a horrible day in the history of our country. Ms. Eicher
> helped make that horrible day possible.*

He continued:

29

> *The obvious truth is that January 6th was tragic.*
> *It was terrifying.* And in the individual moments of that day it was worst for the men and women in law enforcement desperately protecting the Capitol and the people who work at Congress who were just doing their job that day. They were outnumbered, scattered, facing a purposed riot like had never been seen before in the history of this country. . . .
>
> *Now, in the end, the good guys prevailed.* [Emphasis added.]

 (J.A. at 317–18).

There was no contemporaneous objection registered to these prosecutorial assertions, which means that this Court will evaluate them using a plain error standard of review. *United States v. Brown,* 508 F.3d 1066, 1071 (D.C. Cir. 2007) ("We review unpreserved claims only for plain error . . . .") Accordingly, we are required to demonstrate the existence of

> "(1) a legal error that was (2) 'plain' (a term that is synonymous with 'clear' or 'obvious'), and that (3) affected [his] substantial rights." *United States v. Sullivan*, 371 U.S. App. D.C. 369, 451 F.3d 884, 892 (D.C. Cir. 2006) (citing *Olano*, 507 U.S. at 732-34). "If all three conditions are met, we retain discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 892-93 (citing *Olano*, 507 U.S. at 735-36). Appellant has the burden of proving each element of the plain error standard. *Olano*, 507 U.S. at 734.

*United States v. Brown*, 508 F.3d 1066, 1071 (D.C. Cir. 2007). We submit that these requirements are met here.

This case relates to one of the most inflammatory, controversial events in this country's recent history:  the storming of the Capitol building on January 6.

Ms. Eicher, unlike numerous other defendants arrested concerning this incident, did not assault or threaten anyone, did not push back against police barricades and did not even yell at anyone.  She entered the Capitol and was present there for a brief period.  In this context, assertions of personal opinion about how terrible and reprehensible the storming of the Capitol was -- tragic, terrifying and horrible -- placed her due process rights at particular risk, given her relative lack of alleged culpability.  The above-quoted statements expressed prosecutors' personal political opinions and were unduly and unfairly inflammatory, warranting reversal.  *See, e.g., Brown,* 508 F.3d at 1075 ("It is clear in this case that the prosecutor erred in expressing his personal beliefs regarding appellant's guilt"); *United States v. Dean,* 55 F.3d 640, 655 (D.C. Cir. 1995) (counsel must stick to the evidence and refrain from stating personal opinion); *United States v. Cole,* 862 F.2d 361 (D.C. Cir. 1988) (inflammatory prosecutorial argument is impermissible); *United States v. Monaghan,* 741 F.2d 1434,   (D.C. Cir. 1984) ("a prosecutor may not make statements calculated to arouse the passions or prejudices of the jury," and "may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking"); *Harris v. United States,* 402 F.2d 656, 658 (D.C. Cir. 1968) (an advocate's expression of personal belief is impermissible).  Given the prosecutors' statements to the jury in this case, it is

respectfully submitted that plain error exists, warranting reversal of the

convictions.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should vacate Ms. Eicher's convictions

and direct a judgment of acquittal on all counts.

Respectfully submitted,

<u>/s/ Barry Coburn</u>
Barry Coburn, DC Bar No. 358020
Coburn, Greenbaum & Eisenstein, PLLC
1710 Rhode Island Avenue, Northwest
Second Floor
Washington, DC  20036
Tel:  202-643-9472
Email:  barry@coburngreenbaum.com

## <u>CERTIFICATE OF COMPLIANCE WITH WORD LIMIT</u>

I certify that this brief contains approximately 7613 words and is prepared

in Times New Roman, 14-point font.

/s/ Barry Coburn
Barry Coburn

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this Opening Brief, and of the accompanying Joint Appendix, will be served on all counsel of record, this 8th day of July, 2024, using this Court's electronic filing system.

/s/ Barry Coburn
Barry Coburn